May it please the Court, Britton Sparkman, Counsel for Appellant, Easy Street Ltd. This appeal is of the District Court for the Southern District of New York's grant of summary judgment in favor of Leopard Marine and denial of summary judgment for Easy Street, as well as a denial of an earlier motion to dismiss based on international comedy grounds. I'd first like to take a moment to address the Court's order of yesterday relating to jurisdiction. I must have woken you all up. Yes, Your Honor. Yesterday. Jurisdiction issues with respect to the Declaratory Judgment Act, which requires a case in actual controversy in the jurisdiction. I believe, based on the research that we've done on behalf of Easy Street, that this Court's decision in GFK v. Aquamarine, 697F3-59, explored in quite a bit of detail whether a court... Was that in your brief? It was not in the brief, Your Honor. It was in response to the order yesterday. But explored the issue of whether admiralty jurisdiction can be a sole basis for a Declaratory Judgment Act action. That case involved a dispute concerning a bunker supply contract, and so much like this case, even though the parties were not in privity of contract, the Second Circuit said that if it relates to a contractual matter involving maritime matters, then that would invoke admiralty jurisdiction. The Court went on to say that even though the Declaratory Judgment Act could be used in a case which only had admiralty jurisdiction pled by the parties, that there would still be the necessity to do the Skelly Oil v. Phillips Petroleum analysis to realign the parties to determine what the roles would be had the action been brought the other way. So that takes us to whether you could have brought an action in New York. Correct, Your Honor. And so we would answer that no, Easy Street could not have brought an action in New York. There's no claim, controversy, or case between Easy Street and Leopard Marine. The only action that Easy Street could have brought was the action that was brought in Panama, an in-rim maritime lien against the Bissell itself. The maritime lien pursuant to the Commercial Instruments and Maritime Lien Act would only provide for an ability to arrest a vessel in-rim. In GK, the case you just summarized for us, was there an arrest of the vessel in that case? No, Your Honor. That case did not involve in-rim jurisdiction specifically. Admiralty. The admiralty can support a declaratory judgment if the contract related to maritime issues. Correct, Your Honor. And so here, the vessel did not actually come to New York. It was not within the jurisdiction of the Southern District of New York. It never was actually in the United States at any time since the acquisition of the lien in 2011. One point that I would like to briefly address sort of on top of this issue, this court's decision in Hoppag-Lloyd v. U.S. Oil Trading from last year, 814 F. 3rd 146, the court went through the history of is there a distinction between subject matter jurisdiction and in-rim jurisdiction? Of course, there is. And so you can have situations where a party can come in and say, well, we waive the fact that the vessel was never arrested or seized. And so we're defending this matter as if it were here in the jurisdiction. What I would say to that is that in this particular case, the action which Leopard Marine and the relief which it has sought is an equitable defense to a maritime lien claim. It only arises in response to the proper exercise of jurisdiction in-rim over a vessel. It's not an affirmative claim that could have been brought by either party in persona. And so that's where District Judge Rakoff went off in the analysis when rejecting the exceptional circumstances that were argued in the first decision relating to international comity. He didn't find that the court did the analysis of the various factors which are looked at under Royal Sun. Neither did not find them particularly compelling but looked at them in the totality of the circumstances. Easy Street made a basis for this case to be dismissed on international comedy grounds. The principal matter with respect to exceptional circumstances existing here is that the only court which has ever had jurisdiction over the rest is Panama. And there are- And you're saying that your client could not have brought an in-persona claim against Leopard Marine. Correct, Your Honor. That the only basis it was proceeding was against the ship. The only basis which it's proceeded this entire, since 2015, is against the ship. Would you concede that, or maybe you don't concede, would the United States law govern this dispute if it was heard in a Panamanian court? United States law absolutely governs the dispute. Because of the contract, the chartering contract. Because of the contract and because of the way that maritime lien law under the supply of necessaries has developed since the Ninth Circuit's decision in Transtech in 2008 and the progeny that's continued over the last decade. That's one of the factors we look at under Ray Sun, whether the United States law, Royal and Sun. Yes, Your Honor. United States law is the basis. It makes it a little closer to New York and jurisdiction, doesn't it? The fact that U.S. law will govern? Yes, Your Honor, but the district court didn't dispute the Panamanian court's ability to apply U.S. law. Was it raised below? It was raised below and discussed below. The court didn't dispute that the Panamanian court would have the ability to resolve issues under U.S. law. What the court found was that that court would have the preclusive effect of res judicata, should it determine the rights and remedies of the parties in enforcing a maritime lien and the defense of latches. And, in fact, in the record, in the Panamanian court, Leopard Marine had filed what's called an apremio challenge to the arrest of the vessel contesting that latches applied. And the Panamanian court had found that, no, we're not going to dismiss on this basis. Subsequent to that, and unfortunately it's not in the record because it just came down yesterday from the Panamanian court of appeals, Leopard Marine had raised last year a request to dismiss the action in Panama on the basis of Judge Rakoff's decision. We don't have a copy of that order yet, but the case is going back to the Panamanian maritime court because the court said, no, we have the ability to exercise jurisdiction over the vessel in rem. And it's the only court in the world that's ever had jurisdiction in rem over the vessel for the enforcement of this maritime lien. I'm running low on time, but I'll save for a rebuttal in my comments about the latches issue. Fair enough, we'll hear from opposing counsel representing Easy Street or Allied. May it please the court, Christopher Dillon for Plaintiff Appley Leopard Marine. Because the defendant's contract to supply marine fuel to a ship is within the court's maritime subject matter jurisdiction. And because the party's dispute about defendant's lien rights are also within that jurisdiction. And because that's a live controversy. And because the GFK or Garinta rule asks that you look at it in the mirror image. And in that mirror image, there's a live dispute. There is maritime subject matter jurisdiction. What I would refer the court to in respect to the argument that in personam and in rem is somehow a dispositive thing, is the dismantling of that argument by the Supreme Court in the continental, the FPL barge case. And that's a case where there was a lawsuit in New Orleans and it was an inconvenient forum. So they wanted to transfer the case to, I don't remember the district, but let's say it's Baltimore. And the argument was, well, the ship wasn't there. You can't transfer it because it originally never could have been brought there. The court said in rem actions economically are designed to get the owner, the ship owner, to pay for a liability. Let's not trick it up more than it is. So if you've got a suit to try and get the ship owner to pay, yes, you have an in rem right. But really all you're doing is doing what they did here. You arrest it. The owner has to post a bond, which is backed by cash here. So there's more than $2 million sitting in an account in Panama backing up a very live dispute. The defendant's contract chose U.S. federal law and the New York courts for deciding any dispute. A day after the arrest, we were able to get into the district court here to get an action filed, to get a declaration that by reason of the Lachey's Doctrine, there was no maritime lien. That ruling, the district court, and hopefully from this court, is then available as a res judicata piece to be taken down to Panama or any other place where the dispute over whether there's a maritime lien is alive. Is that what was decided yesterday? No. As I understand it, the arrest comes in, and in their procedure, there's an opportunity to challenge the prima facie case of the arrest. The court, as I understood it, said that doesn't entirely take account of the Lachey's defense, which in a sense is a defense to a prima facie case that you had a maritime lien. And besides that, we have only currently a ruling of a district court, which is not yet finaled because there's a pending appeal. There will be a hearing in the district court, well, the lower court, the court of first instance in Panama, on April 20. That court will hear all of these issues available to them. We would hope to have a full res judicata decision that we could present to the court there that says that what Judge Rakoff did here was correct. Do you say then realigning the parties as this declaratory action requires us to do that Easy Street could have come into court in New York and said, I want to, I want what? I want to do what they exactly did in Panama, which is I want you to pay for the bunkers that were ordered by Allied in 2011 and never paid for. Was that a remedy that was available even if there had been no in-rim proceeding in Panama? There are places in the world where you can make the argument that by reason of the fuel being onboard the ship, they have a right to claim against the owner. Most jurisdictions in the world require that. I'm sorry. We can narrow it down. What about New York? That's what I'm concerned about. Well, what I would say is it was just a ruling in the Florida court saying that in these circumstances, yes, you can bring that kind of claim. It's part of the dispute that's bubbling up in the Oak W. Bunker problem. So it's out there. Besides that, there's choice of law issues, which at this point, the Panamanian court has said it will look to U.S. law. So there's both a live dispute, and it's a live dispute about U.S. law and laches. And Judge Rakoff was eminently qualified to decide that. It's the kind of issue that gets lost in translation before a Panamanian court that has a civil law system that doesn't have anything like laches or equitable consideration. And that leads me to the second issue, which is abstention. And there's nothing here that required abstention. The federal law issue is an important one for deciding whether or not the court ought to take it. I should remind the court of the Ewell decision, which was a declaratory judgment action in maritime law. The court said the fact that you've got a maritime law issue means we're not getting rid of this case. And it reversed Judge Preskin and the district court on that basis. That case went up and back to the Supreme Court. And by the way, no one questioned subject matter jurisdiction in that case. The reason that case was brought is the parties didn't like the Texas forum that was otherwise being brought. So you've got somewhat similar facts. You've got a parallel action in Texas, action in New York, and the New York court was the proper court to decide it. In addition, the other argument they raised is that NREM somehow was a special factor in the abstention analysis. Yet, as I pointed out in the brief, the Caravelle case, which looks at the LIDA, says that's really only a problem when you've got two NREM cases. When you've got two courts trying to control the same property, yes, you have a problem. When you've got an NREM court that's being asked to declare rights in relation to property that may be subject to NREM jurisdiction, you don't have a problem. And those cases are cited in our brief, and I think that disposes of the argument. Because there's no suggestion here that what's happened has interfered with anything in Panama. In fact, I think they're going to welcome hearing from a court here on how laches plays out. And what I ought to move on to— Even though they don't have such a doctrine in their law, they would apply our decision on laches. That's certainly what we would expect. I'm not familiar with the Panamanian rules on res judicata, but I would expect both that they would consider it interesting. Proof by expert at a minimum, and hopefully fully res judicata. So when we get to laches, there's a dispute about what's the appropriate standard of review. We've pointed out that in the Dickey case and the DiSilvio case, which are maritime cases with subject summary judgment rulings, the court said it's abuse of discretion. The Supreme Court, in the Gardner case, has said laches is a matter that should be addressed to the discretion of the district court. When you've got discretionary matters, those are always something that has to be reviewed by abuse of discretion. It's a question of what should you do? Is it in the range to be expected? And here, there's really no dispute, or there shouldn't be any dispute, that the balancing of the factors here is properly within the range of appropriate discretion. And what I would do on the first issue, which is delay. The evidence is that Easy Street decided to pursue its in-rem remedies only after it was unable to get money on the contract claim, and only after it pursued a different ship to Dauphin, which was arrested in Panama and settled in 2013. So, essentially, the facts in that, although they don't factor in Judge Rakoff's decision, are important in considering the equities. Because what Easy Street did is they sandbagged the manager by attaching one ship and then withholding this claim. Both of them could have been settled at the same time. I understand the argument that you waited, that Easy Street waited three and a half years, and the argument about prejudice. But is that really the case? And you can help me understand the record. As I understand it, by January 2012, 1st of January, Allied had been declared — the Greek bankruptcy court said Allied couldn't pay its debts. It was insolvent. So even if Easy Street had acted earlier in attaching the ship, would it have made a difference? The answer is yes. To correct the dates, the bankruptcy occurs in November 2012, so more than a year, okay? In between, there were rights for indemnity and recovery that my client, Leopard, could have taken advantage of, including both on its own ship and in respect to the Dolphin. So it had chances to recover that back. And that's one of the comments of Judge Friendly in the Lucy Schulte case, which you've cited, which is when you've got a charter situation where you're trying to compel an owner, who's essentially an involuntary guarantor to pay, you need to act quickly to tell them that there's a problem. And that didn't happen here. Instead, they sandbagged the owner. But there was no latches between the beginning of this, which I dated, say, August 23rd, when Allied purchased the fuel, August 23rd, 2011, until November 6th, 2012. That's only about one year and a couple of months until Allied declared bankruptcy. So that's when it was all over with, really. The next three years, until Easy Street arrests the vessel, I don't know that Leopard could have done anything. Let me bring up two factors. In terms of monetary things, it's correct that once they're in bankruptcy, the opportunity to grab money from Allied for what you're being asked to pay Easy Street gets pretty difficult. We think that that shouldn't figure in the latches analysis. But there's also evidence. There's questions of whether there would be evidence that might provide a defense to the underlying maritime lien claim. Were there payments made? The record, and this goes to your sandbagging case question, sorry, Your Honor, is that there were two ships that Leopard had on to Allied. The first one is the Leopard. It has the larger bill. But within four months, Easy Street was pursuing the Dolphin claim and had that ship arrested within ten months of when the debt was due. They decided not to say anything about the larger Leopard claim during that period until after that claim was settled. What do you make of those circumstances? Right. Well, I think it's inequitable. They were sandbagging the owner. They were trying to move the thing further when they could grab the money. What do you mean move the thing further? I don't quite. Which is. I'm not sure I quite understand this strategy. What is the thing? The thing is they've got a large debt with Allied that hasn't been paid. They're stringing it out and arresting the Leopard later on. Why would they send it to do that? That's one of the questions is was there money that was perhaps paid towards the Leopard, which gave them a reason not to pursue it early. Otherwise, I agree with you. I don't understand the logic of not pursuing the ship. And that's where I wanted to go was with this Court's ruling in the OAHI, is a ruling that both looked to the one-year rule in New York and said that if you're pursuing only your contractual claim and not pursuing your in-rem claim, that's not a justified way to proceed. A lien claim is separate, particularly when it's a lien claim that's going to be pursued against someone that's not a party to your contract. And so if you sleep on that right, which is what was happening here, and you do it deliberately as a willful decision, that's a ground for latches. And what I cite the Court to is the Gulf Oil case, which is a case where this Court had a bank that had to take over a vessel, and the Court said where there was an increase in the credit of the shipbuilder's charterer — let me step back — the bunker supplier is supplying fuel. There are defaults, like here, by the charterer. The bunker supplier continues to supply fuel and then tries to recover it back from the bank who's taken over the ship. This Court said there is no equity in that case. Due to latches and not pursuing those claims quickly and not telling people that that was happening, you've lost the lien. That's the question I started this with. What's the period where the latches is harmful to Leopard? Everything that—any relief they could have gotten from Allied ended on November 6, 2012. Now, it took them another two, almost three years to arrest the vessel, but what could they have done if they knew sooner? Allied declared bankruptcy in November 2012. I understand the question. Let me first go to what's the proper period. And the proper period we submit is the one-year rule, which is the rule that's stated in most world conventions, which is the rule that would be in Chile, and it's the rule that New York said should apply. And the doctrine of latches is a doctrine where the federal court is deciding what period should we look at before it's too late. That's the question I'm asking you. And you don't need to get down in the weeds to look at the New York rule that says, oh, well, we'll give you an extension if you're not back to where the original supply occurred. Federal law has a doctrine already in place that looks to see are there reasonable opportunities to arrest the ship. That's all very interesting, but it's not what Judge Poole is asking. I'm very much interested in the answer to her question. I'm saying one year is the important time period. And if you think one year is the important time period— One year from when? One year from the time you first supplied the ship and you have some opportunity to have a lien. And what I'm pointing to is examples where people have pursued that right within the one-year time period. The Dolphin is one, and there are others. I'm saying the one-year period in New York law looks to the same period. I'm saying the conventions say that's the same period. So there's a confluence of factors that says look to one year. Here's my question. Between March 6th, 16th, and April 20th, 2012, when Allied is sending Easy Street written assurances that the bill will be paid, should Easy Street have notified Leopard during that period? I mean they had six months from March 2012 until bankruptcy is declared in November, but that's still six months, only not a year. The answer is yes. And the other answer is they were doing that on the Dolphin claim in April of— Keeping them informed. They sent them threats, and they were keeping them informed, and they were chasing the ship. So what they were doing is, yes, they were behaving that they should let them know, chase them, and grab the ship as soon as possible. But they put off doing it in this case. And during that period, as Your Honor is pointing out, the big harm, which is the right to get any indemnity, disappears. So let's summarize this part of our discussion. Tell me when the period begins for the one-year LACHI statute of limitation. From my perspective, it starts on the day of supply, because that's the day upon which you have the right. Now, Easy Street gave them 30-day credit terms, and so I understand that probably you're not going to pursue an MRAM right before the money's due. It takes you to September 2011. And then you probably got 90 days, some period like that. That's the kind of period the Court was considering in Belfort. The end date was due September 26. Right. Right. I think you have to start there, right, when the invoice is due. All I'm going to say is the lien, of course, would arise on the supply. I understand why I wouldn't win a LACHI's argument at that point in time. But I think by the time you're talking November or that time period when the ship was being redelivered, yes, you know you're not getting paid. That was a year later. No, no, no, November 2011. Sorry. November 2011 until they declare bankruptcy is a year and a month. I was pointing out that in November 2011, that's when the ship is returned to Allied and my client pays over the $400,000 for the fuel that's on board, which it wouldn't have done if it was on alert that Easy Street hadn't been paid. But in any event, that's a year when Allied delivers the vessel to Leopard until Allied declares bankruptcy. Yes. That's a year. Correct. That's the year. That sort of answers the question of when does it begin for me. When does the period that we're looking at to decide LACHI's, when does it begin? I understand how Your Honor can come to that conclusion. Let me refer back to that it's a discretionary matter, and it's assigned to the district court, and what the district court did here is within the parameters of other decisions, and particularly LACHI, that says if you didn't move in that one-year time period, you're barred. I want to show both inexcusable delay and prejudice, right? So one argument that your adversary makes, if I understand it correctly, is that Allied was functionally bankrupt as of January, so you couldn't have recovered from Allied was insolvent as of January, so it couldn't pay its bills. Well, the evidence is that they were paying my client their hire, and that the Dolphin, which was ongoing, was being paid as well. The other evidence is that other bunker suppliers attached other ships in that same time period. But, of course, the Dolphin material is extra record in this case. No, it's in the record, Your Honor. It's both in the testimony of the witness and the documents are in the record. We certainly can't rely on anything that happened in that case in deciding this case, can we? Well, I think it's an equitable factor that you could consider if you wanted to rebalance what we say is subject to abuse of discretion. All right. Thank you. Thank you. Mr. Sparkman, you've retained two minutes for rebuttal. Thank you, counsel. Thank you. Thank you, Your Honor. It's a lot to unpack in two minutes. I'll be generous. Okay. Thank you, Your Honor. I would start with a couple of points. One, the Denza Dolphin is a complete red herring in this case. These are maritime lien claims that run against the vessel only. There's not an ability to do a sister ship attachment, a sister ship arrest, an ability to say, hey, you have this claim against this vessel as well as this other vessel, so pay us for both. And what counsel leaves out is that the Denza Dolphin case was actually contested for well over a year, and they lost in Panama before finally settling. So it's not so much a matter of, hey, if Easy Street had just put us on notice, then we would have suffered no prejudice, there would have been no delay, and so we would have paid the amounts that were indisputably due and owing. That's not present, not in the record, not in the testimony during the deposition of Leopard's witnesses, and certainly wasn't relied upon or even looked at by District Judge Rakoff. Let me hear your argument again as to why you would justify in the delay in arresting the vessel. Yes, Your Honor. Delay is not present here. The District Court looked at the analogous statute, found that it had not run. So it was Leopard's burden to prove delay. Delay presumes in effect that you dilly-dallied around and could have gone after Allied earlier. In fact, you tried to collect other invoices from Allied, so you knew there was, one, a payment issue, and you knew probably what their financial position was like because you had close ongoing dealings with them. And they said, in essence, if you'd moved earlier, you would have had a much greater chance of collecting this money from the proper party, which was Allied. Yes, Your Honor. I believe, if I may, just in responding to that, what the record showed was that over the course of 10 years, Easy Street had approximately 1,000 different deals with Allied. And so when you look at it in the context of course and scope of their prior dealings, industry norms and custom, they had been paid on virtually all of those. That also means you were more likely to be intimate with their financial circumstances, long-time customer. But that's not what I was asking you. That's just a little background to take, which would not be what I was asking you. What I would say is that delay can only arise if there is an actual actionable right, which can be enforced in a jurisdiction where the maritime lien would be recognized. What Judge Rakoff found was that actually Easy Street, to exercise its right, should have arrested the vessel essentially within 90 days of the lien accruing, without regard to whether or not the vessel was actually in a place in a jurisdiction. Your position is that you had a generous period of time. You could track this vessel from port to port until you finally got it in a port that was plaintiff-friendly. Whatever the right admiralty term would be. And that's what you did. Well, Your Honor, not just plaintiff-friendly. Recognizing the right at all, both procedurally and substantively. What Judge Rakoff has done in finding that there was delay because of any delay, has essentially created a new rule. What would you do to collect your money from Allied in a commercially reasonable manner? I think that that was. Give them a couple of e-mails which are disputed. So it's certainly not the kind of e-mail traffic that you'd expect to see on a million-dollar or half-million-dollar claim. Right, Your Honor. But what I would say to that is that there's two schools of thought which both apply here. One is that there's absolutely no requirement. An in-rim maritime lien claim is separate from the in-personam contractual claim. So pursuing the contractual claims, as Judge Chin held when he was a district judge in the KPI case, which was affirmed by this court on summary order, was that actually there's nothing wrong with attempting to go forward with your contractual claim, that you can treat a maritime lien as a remedy of last resort. And that's something that the Third Circuit's held as well in Bermuda Express, which was in our papers. And so there's nothing inherently delay or no inherent delay by virtue of the fact that on a parallel track, our client was attempting to recover payment from its contractual partner. And one thing that I would just like to say because- It doesn't look like you were doing very much at all. Your Honor, what I would like to say that I think- What did you do? What did our clients do? The testimony in the record, Your Honor, was that the clients sent e-mails, the clients sent demand letters. How many e-mails? At least two in the record. That to me amounts to next to nothing. What else did you do? Right, Your Honor. Also meetings and telephone calls. What I would say, one thing- How many meetings? I'm not sure, Your Honor. How many telephone calls? Multiples, at least ten. But, Your Honor, the delay- Then you chased more aggressively other Allied obligations, right? Your Honor, not until after it became clear that Allied was not going to pay on any of the 15 claims. So what Leopard has done is played fast and loose with the timelines of when things happened. The unreasonable delay is unreasonable delay in arresting a vessel to enforce a lien, not unreasonable delay in pursuing contractual claims, which under their contract, under general contract terms, you would have had years to pursue those, a minimum of four years to pursue a contract claim. So the delay standard is just with respect to the maritime lien. And here the vessel did not call the United States. So you had a common standard remedy when you don't get paid, which is a maritime lien. And so what you're telling me is, well, we dilly-dallied in getting this invoice paid for months and months and months because we knew that ultimately there was a maritime lien or we had four years or six years or whatever it was to try to enforce our contract before whatever applicable statute ran. And they're saying, well, while you were doing all the-taking all these modest steps, Allied goes chapter, and there's the money. Your Honor, I would say that it's not dilly-dallying to pursue- I'm sorry, you know, I didn't mean to- And what I would say also, Your Honor, is- I'll accept your-I mean, you can put whatever characterization you want on it. Sure. But it doesn't seem to me to be the facts. Well, the record reflects that payments were actually coming in on other claims. So there was no reason not to have a reasonable good faith belief that Allied would pay. The record also reflects that there had been delays in payment in the past. That is common in shipping. And the historic purpose behind the Maritime Lien Act is to allow ships to continue in commerce. An arrest of a vessel, as numerous courts have found, is extremely disruptive, both to the ports in which it occurs, the courts, as well as the owners of the vessel. So there's nothing inherently unreasonable in seeking to obtain payment from a contractual partner. And one parenthesis that I would like to just highlight for the Court, and is in the record but maybe not clear, Allied did not voluntarily go into bankruptcy. It was continuing to attempt to stay afloat. It was attempting to pay its creditors. It was continuing to trade vessels. It was put into bankruptcy involuntarily. So what? What difference does that make? The difference, I think, is the categorization of whether or not it can be believed that payments would be received. So what that suggests is that there was information out there that Allied was in significant financial distress. If you're saying that creditors put it into bankruptcy, it's not like a Chapter 11 where, you know, a company puts itself into reorganization. Right, Your Honor. But what I would say to that, again, is that that would presume that there would be some sort of equitable basis to exclude the lien because credit was extended to a counterparty and a vessel when there was a known inability to pay. That's not the case here. That all occurred after the fact, after the acquisition of the lien. There may be differing ways to look at these facts, but as your time is running out, long run out, exactly in what respect did Judge Rakoff abuse his discretion? Your Honor, and we haven't talked about it at all, which I limit. That's why I'm asking. That's why I asked the question. Yes, Your Honor. It's a conjunctive test. So the second part, the prejudice. We know the test. I have these law clerks sitting there who give us the test. But how did he abuse his discretion? He abused his discretion with respect to the delay factor by stating that any delay was too much delay because he found that the vessel could have or should have been arrested as early as November 2011. And he fashioned another test, which had never been applied in any laches decision, when applying the prejudice standard by instead of demarking a point in time by which prejudice. So under the prejudice requirement, a arresting party has to cause a prejudice to the defendant that would not have existed if action had been taken sooner. Here, that prejudice existed throughout. The record shows that from Leopard's own testimony in the depositions, was that they did have a $9,000 claim which they pursued against Allied and have no ability to recover that $9,000 claim. And that was a claim which was accrued as early as November 2011. They have no expectation of being paid on it. So the parties were exactly in the same spot as they would have been whether the vessel was arrested in 2012, 2013, or 2015 as it was. And one final point that I would like to just, if I could be heard. You had said when we were talking about inexcusable delay that Allied was paying some of its bills, and that was a reason why your client had some confidence in not immediately trying to arrest the ship. They were paying some bills, Your Honor. But that doesn't change the fact that the claims which were not paid, which were brought after a time when the Greek bankruptcy court declared them insolvent, could not be recovered. And in fact, the action that was brought by Leopard, as I understood it, was an arbitration. And again, the KPI case again talked about that, that the difference between bringing the claim in 98 or 2002 didn't really change the position of the parties because they had no assets. One final point you said? The one final point is with respect to the record and how shipping works, Leopard Maritime has made a big issue about the fact that they paid back for bunkers which were on board at the time of redelivery, and had they been put on notice, they would have been in a position to at a minimum retain that $400,000. These are complex and sophisticated business entities that regularly do business and trade ships. When a ship is redelivered from a charterer to an owner, there is a statement of account and accounting where the parties set forth each side. The charter party in this case required that bunkers be paid for upon redelivery. So that is true and that is what happened. But every owner has the right and the obligation to obtain and satisfy themselves that said bunkers were actually paid for by their charter party. The fact that they chose not to do that in this case does not mean that Easy Street caused a hardship or a prejudice to them by arresting the vessel, and they were unable to obtain that money. On that note, thank you for library hours.